Sylvia DANSKER, Plaintiff-Appellant,

v.

Belle GELB, Defendant-Respondent.

No. 48725.

Supreme Court of Missouri,

Division No. 1.

Dec. 11, 1961.

Charles M. Tureen, St. Louis, Jack H. Ross, Clayton, William L. Mason, Jr., St. Louis, for plaintiff-appellant.

Herbert E. Barnard, James E. McDaniel, McDonald, Barnard, Wright &

Timm, St. Louis, for defendant-respondent.

WESTHUES, Presiding Judge.

This is an action for damages for personal injuries alleged to have been sustained when plaintiff, Sylvia Dansker, on June 4, 1959, fell down a flight of stairs at defendant's (Belle Gelb's) home when plaintiff was frightened by a dog. A trial resulted in a verdict for plaintiff in the sum of $23,500. The trial court sustained defendant's motion for a new trial and plaintiff appealed.

Plaintiff, in her petition, based her cause of action on the theory that the defendant "owned, harbored and controlled a certain dog which was of and possessed a mischievous and vicious propensity, and was of the habit of attacking persons without cause or provocation." It is stated further therein that prior to the day plaintiff was injured defendant "knew or could have known of the vicious and mischievous propensities of said dog."

The trial court granted a new trial "on points 1 and 11" of the motion for a new trial. These assignments read:

"1. The verdict is against the evidence."

"11. The Court erred in giving and reading to the jury erroneous, misleading, illegal and prejudicial instructions requested by plaintiff, and erred in giving each and every instruction given on behalf of plaintiff."

The motion for new trial contained 23 assignments of error. No. 2 read as follows: "The verdict is against the weight of the evidence." Only two instructions were given at plaintiff's request. They were No. 1, which submitted the case to a jury on the merits, and No. 8, which concerned the measure of damages. The trial court, in a memorandum which was filed with the case, set forth specifically the reasons for granting a new trial. We shall refer to this memo later in this opinion.

The above statements concerning the action of the trial court in sustaining the motion for a new trial should be kept in mind in considering the correctness of the court's ruling in view of the evidence. The defendant, in support of the trial court's action, argues that granting a new trial on the ground that the verdict is "against the evidence" is equivalent to stating that the "verdict is against the weight of the evidence." Further, defendant says that the evidence was insufficient to support a verdict for plaintiff.

Plaintiff, in the brief, contends that the trial court was in error in granting a new trial and argues that in this case the court in stating that the "verdict is against the evidence" did so on the theory that plaintiff had failed to prove a case. Plaintiff says further that the evidence was ample to support the verdict. We are of the opinion that plaintiff's contention must be sustained.

There was not a sharp dispute in the evidence as to what occurred. Plaintiff, the defendant, and three other women had been meeting at each other's homes about once a week during the past ten years to play mahjong. On the evening of June 4, 1959, these ladies were to meet at defendant's home. Plaintiff was the first to arrive and while waiting for the others, defendant suggested to plaintiff that she go to the basement with her to look at some furniture. After doing so, defendant told plaintiff she would like plaintiff to see her dog. It was then about eight-thirty o'clock in the evening. Plaintiff gave the following testimony:

"Q. Then what happened when you got upstairs? A. Well, we got to the top of the landing and she mentioned something about her dog who she had previously mentioned about having difficulty with."

Defendant, in her brief, described what occurred as follows: "The two ladies then proceeded back upstairs. The stairway goes up straight from the basement to a

landing on the first floor. There is an ac- cordian-type door at the top of the stairs, and on the opposite side of the landing is a door leading on the outside. To the right of the landing was the kitchen, and to the left was the dining area. The landing is big enough for the outside door to open inward. As plaintiff came up the stairway to the landing, Mrs. Gelb told plaintiff she would like plaintiff to see the dog and then opened the back door and pushed open the screen door. * * * When Mrs. Gelb opened the screen door, the dog came in, raised up on his hind legs, and plaintiff stepped backwards at least a foot to the edge of the steps and fell down the stairs to the bottom of the landing. There is no evidence that the dog touched plaintiff."

Note plaintiff's evidence as to what occurred:

"Q. Then what happened as you were standing there when she pushed the door open to whatever degree it was and you were standing in this position, then what occurred? A. Then the dog, I heard him, could hear him, but I was under the impression that he was further out in the yard. I mean, I had intentions of just stepping out on to the little porch, whatever it is there, to see the dog, but as soon as she opened the door, why he just came right in.

"Q. Was the dog making any sound? A. He was making sounds and growling and he jumped and lunged up on me and he towered over me. I mean, I just looked and there this black thing towering over me, and I could see his teeth.

"Q. Was it a large dog? A. Yes, he was large enough to tower over me.

"Q. Did he come directly toward you? A. Yes, he did, because I was standing right in the center there.

"Q. And you say the dog did raise up? A. He raised up on his hind

legs, far enough in, close enough to me, practically on top of me.

"Q. And when this happened, what did you do? A. I jerked back. I mean, it was just a natural reflex, a jerk back, and I just went down the stair.

"Q. You fell down these basement stairs? A. Yes."

Defendant did not dispute that evidence. Note her evidence given on cross-examination:

"Q. Were you in a position where you could see her when she fell down the stairway? A. It all happened so quickly, I just really don't remember.

"Q. Well, let me ask you this. You heard her testify and describe what happened and how the dog, when he came, in, lunged up and that she jerked back to get out of the way. A. Yes, sir, yes, sir.

"Q. Is that what happened? A. Yes, it was, sir.

"Q. Did Mrs. Dansker say anything that was untrue to your knowledge? A. No, sir."

Defendant, on direct examination, testified to the following with regard to the dog's being tied:

"Q. Now, where did you have this dog tied to, a stake, what did you have? A. There is an electric meter in the back yard on a very strong pipe and we had him attached to that.

"Q. When did that start, with reference to June fourth, before June fourth, a matter of weeks or what? A. We always had him on there.

"Q. After he grew up, is that it? A. That is right.

"Q. How far would that leash or chain or rope extend? A. Well, towards the house or towards the fence. The dog could come to the

kitchen door and just go inside the door and sit and lay right by the screen door, but no further."

It was in evidence that the dog was at the time of the occurrence about nine months old and rather large. The defendant had acquired the dog when he was a pup.

Defendant, on cross-examination, admitted that the dog had, prior to the occurrence in question, lunged at a neighbor and that the neighbor in jumping to avoid the dog had injured his back. She further admitted that the garbage men were afraid of the dog and that the family had talked about getting rid of the dog. She testified that the dog was very friendly to children and members of the family but often otherwise toward adult strangers. Note her evidence:

"Q. (By Mr. Ross) Mrs. Gelb, as I understand it, what trouble had occurred with this dog was toward strangers not towards your family, that the dog was brought up with, isn't that correct? A. Towards adults, adult strangers.

"Q. And, of course, Mrs. Dansker, to this dog, would be an adult stranger? A. Yes, sir.

"Q. So there is no contention here that the dog ever harmed your own children or people that the dog knew; the trouble was all concerning adult strangers? A. That is right.

"Q. And you say that the dog when your daughter had it out on this leash or chain or whatever it was, did the dog jump up or lunge on its hind legs at this person? A. He tried to. She pulled the leash back.

\* \* \* \* \* \*

"Q. And you had received complaints from the trash men prior to this occasion that they were frightened of your dog, in other words, the actions your dog took toward these men,

they advised you frightened them? A. His barking frightened them."

There was no evidence whether the home where defendant and her family lived was owned by any member of the family or whether it was rented. Further, there was no specific evidence whether defendant or any member of the family owned the dog. In reference to ownership, the questions addressed to defendant always included the words "your dog." Defendant referred to the dog as "our dog." No protest was ever made that such reference was incorrect. No member of the family, except defendant, testified. One other witness, a neighbor, testified for the defendant. She stated that the dog was friendly with her children.

█ It is difficult to understand that a trial court would, in view of that evidence, sustain a motion for new trial on the theory that the verdict for plaintiff was against the weight of the evidence. As we shall attempt to demonstrate, the trial court did not grant a new trial on that ground. First of all, in the second assignment of error, defendant stated that a new trial should be granted because the verdict was against the weight of the evidence. This assignment must be presumed to have been overruled for the reason that the trial judge in his order specified grounds "1 and 11" for granting a new trial. Numbers "1 and 11" do not throw much light on what the court had in mind so we look to the memorandum for enlightenment. See Hammond v. Crown Coach Co., 364 Mo. 508, 263 S.W.2d 362, 1. c. 364(1), and Bierman v. Langston, Mo., 304 S.W.2d 865. In each of those cases, this court ruled that where a trial court, in the order granting a new trial, assigned specific grounds for the ruling, the court's memorandum could not be considered if it contradicted the order made. In the case before us, the order made by the trial court is ambiguous and therefore we look to the memorandum. This memo in no respect contradicts the order

granting a new trial. Hammond v. Crown Coach Co., supra. Before we examine this memo, we wish to and do reaffirm what was said in that case, 364 Mo. 508, 263 S.W.2d 1. c. 366(2, 3), of the futility of trial courts' filing memorandums as a substitute for the requirement that "Every order allowing a new trial shall specify of record the ground or grounds on which said new trial is granted." S.Ct. Rule 78.-01, V.A.M.R., and Sec. 510.330 RSMo 1959, V.A.M.S.

In the memorandum filed by the trial judge, it was stated that the evidence did not support a finding as required by instruction No. 1, that is, there was no evidence that the premises mentioned in the evidence were "defendant's premises" or that the dog was owned by defendant and maintained by her upon her premises. It is stated in the memo that the dog may have belonged to the husband or another member of the family and that the premises may have been owned by the husband or may have been rented by the husband. This was followed by stating, "For error in Instruction No. 1, in assuming that the premises were 'defendant's premises' and in submitting to the jury issues not supported by evidence, and because the verdict is not supported by substantial evidence, defendant's motion for new trial is sustained on Points 1 and 11."

It is apparent that the grounds on which the trial court granted a new trial are questions of law upon which there is no discretion.

We are of the opinion that not only did plaintiff's evidence make a submissible case for a jury but that defendant's evidence confirmed and supported plaintiff's theory.

Instruction No. 1 was not erroneous in assuming that the premises in evidence were defendant's premises. Defendant testified that the premises constituted the family home. It had been

such for more than a year. Whether title to the property was in the husband or whether it was rented property was wholly immaterial. It was likewise immaterial whether the dog was the property of the husband, the wife, or the minor child. The evidence indicated it was a family dog. In the case of Carrow v. Haney, 203 Mo. App. 485, 219 S.W. 710, 1.c. 712, 713, the St. Louis Court of Appeals correctly stated the rule which is applicable to the case before us, as follows: "Appellants' next contention is that Mrs. Haney would in no sense be liable, but we cannot uphold this contention. The husband, William Haney, was away from home at the time the plaintiff was attacked by the dog. It is admitted that plaintiff was invited upon these premises by Mrs. Haney. Plaintiff came in compliance with that invitation, and at the time suggested by Mrs. Haney. If she was lawfully upon these premises, and Mrs. Haney had invited her, or, if she had not invited her and she was lawfully upon the premises or had gone there for a lawful purpose, and the wife, in the absence of the husband, had permitted the dog to run loose upon the premises unguarded, when she knew that persons were likely to lawfully come upon said premises, then her acts of negligence in so doing would concur with the negligent acts of the husband in keeping the dog and producing the injury, and, as stated in Charlton v. Jackson, 183 Mo. App. 613, loc. cit. 621, 167 S.W. 670, 672: * * *." See also Barber v. Hochstrasser, 136 N.J.L. 76, 54 A.2d 458, 1. c. 460 (1–7) (8).

The trial court cited Patterson v. Rosenwald, 222 Mo.App. 973, 6 S.W.2d 664, as authority for the statements made in the memorandum. The facts in that case were materially different from those in the case before us and the case is not an authority for the ruling made by the trial court.

Defendant's evidence clearly showed that she possessed knowledge of the viciousness of the dog. Whether the dog

lunged or jumped at people out of anger or viciousness or out of playfulness is immaterial so long as the defendant had knowledge of the fact that the dog had a tendency through his actions to injure persons. 3 C.J.S. Animals § 148c, p. 1250; Janus v. Akstin, 91 N.H. 373, 20 A.2d 552 (6); Perkins v. Drury, 57 N.M. 269, 258 P.2d 379, l. c. 382(5-7); Owen v. Hampson, 258 Ala. 228, 62 So.2d 245, l. c. 248 (7). Furthermore, the defendant testified, as noted supra, that she knew the leash on the dog was of sufficient length to permit the dog to enter the hallway where plaintiff was immediately before her fall. Defendant opened the door to permit the dog to enter.

Defendant has not briefed any point justifying the trial court in granting a new trial. For a history of "dog law" which traces it to antiquity see State ex rel. Kroger Company v. Craig, Mo.App., 329 S.W.2d 804.

No point has been made that the verdict was excessive. The evidence was that plaintiff was seriously injured. Defendant offered no evidence to the contrary. The family doctor testified at length concerning the injuries. The doctor stated the injuries to be as follows: "Well, medically the diagnosis would be multiple lacerations which in lay terms means cuts. Multiple contusions which ordinary terms means bruises, and in addition to this, multiple broken bone or fractures. These fractures affecting the spine. One of the bones of the spine and two areas of the pelvic bone."

We rule that the trial court was in error in granting a new trial and our order must be that the cause be remanded to the trial court with directions to set aside the order granting defendant a new trial, to reinstate the verdict of the jury, and to enter a judgment thereon for plaintiff as of the date the verdict was rendered.

It is so ordered.

All concur.